We have a fairly busy morning today. We have four cases for oral argument and we had one case submitted on the briefs. Normally we sit in panels of three and JoJo Malley is a member of this panel but she's not able to join us today but she is participating electronically and her views you know well I have a couple questions that come from her and she has participated in all the deliberations and all of the aspects of the case. So that being the case, can you hand me a sheet that's got the break-up? Thank you. Okay, our first case is Schwendimann v. Arkwright Advanced Coating and Mr. Hawks, you reserved four minutes of your time for rebuttal. Is that correct? That's correct, Your Honor. Okay, we may begin. Thank you, Your Honor. May it please the court, Michael Hawes for the appellant Arkwright. Both the Minnesota Supreme Court... Mr. Hawes, regarding standing, it seems like both parties conflated Article III standing and statutory standing in their briefs. So I have some questions for both you and your friend on the other side. Does Ms. Schwendimann's Article III standing depend upon her statutory standing under 281? Your Honor, respectfully, I don't think statutory standing is an issue in this case and I'd like to explain why. It's undisputed that years before this lawsuit was filed, the plaintiff transferred all rights in the patent to another company that is not a party to the case. So the only issue was whether any of those rights came back to the plaintiff. That's a constitutional standing issue. Obviously, this court has also looked at the question... Is there injury for Article III standing solely based on the assignment issue? Well, Your Honor, this court has said there's no Article III injury, in fact, in a patent infringement claim based on that patent. If we conclude that the hand-altered photocopy did not amount to an assignment, could we still find that Ms. Schwendimann was a successor since the company that owned the patent is out of business? Well, Your Honor, we determine constitutional standing as of the day of the lawsuit. And of course, that company was not out of business as of the filing of the complaint. So in determining constitutional standing, we wouldn't look at those post-complaint factual... the change in the company's status months after the complaint. We'd be looking at it as of April 1st, 2011, when the complaint was filed. And at that time, the company was in business. In fact, in September of that same year, the company, by its representative, did assign rights to these patents to the plaintiff in this case. Now, that's months after the complaint, but the company was certainly still in business at that time because we know they filed an assignment and had some board notes and board resolutions that occurred at that time. But, Your Honor, this court and the Supreme Court have been very clear, under Lujan and other cases, that you determine Article III constitutional standing as of the date of the complaint. In this case, that's in April. Go ahead, Your Honor. What's your position on the court's jurisdiction to reform the contract in light of Lone Star? And there we made clear that the requirements of Section 281 are not jurisdictional. Does it then mean that Shenderman has standing just by virtue of her alleging that she's the owner? Your Honor, Lone Star Silicon Innovations addressed the situation where it was admitted that the plaintiff had rights, just didn't... the question was whether they had all substantial rights, which, as you point out, is the prudential standing question. That is not this appeal. This appeal, it's undisputed that the plaintiff gave away all rights, all right and title, years before this case. Was that an actual finding that, for example, there was a finding that she was not an exclusive licensee or had any other type of rights? There is a... the District Court did indeed, in its opinion, find that in the March 31st of 2000 that the plaintiff assigned all rights to the non-party company. So the only question was, did any of those rights ever come back? Because if they didn't, the plaintiff had no rights, which is a constitutional standing issue, not a prudential standing issue. And because of that, Lone Star Silicon Innovations rule about what's needed when you are a person with some rights but not all substantial rights doesn't come into play. The plaintiff here didn't have any rights, unless this court allows for a District Court, after the complaint has been filed, to grant the equitable remedy of reformation, which is what the District Court did. But that would be contrary to... Well, supposing we find that the hand-altered photocopy is sufficient to demonstrate the intent of the parties and so on, and it's sufficient to support reformation. So, respectfully, Your Honor, first of all, the issue of whether the interpretation of that hand-altered photocopy actually provided those rights is not on appeal. The District Court found it did not. That's on page 13 of the record. And that has not been appealed. The other side has not challenged... obviously they're appealing different issues, but they have not challenged that determination. So from a matter of contract interpretation, the District Court said, under Minnesota law, we cannot treat this as an assignment of the rights at issue. And I'd point you, Your Honor, to the appendix at page 13, if you'll turn with me there. The court said, and this is under validity of underlying assignment there, the court said, the purported assignment conveys to Schwindemann Rights in the 984 application, not the 845 application, which is the one that would be needed. The court goes on to say that under Minnesota law, absent ambiguity, contract terms are given their plain and ordinary meaning, and the extrinsic evidence cannot be considered. And that is why, in the very next line, the court had to go on to reformation. Because from an interpretation point of view, it had found under Minnesota law, the rights were not transferred. So the question then becomes, can we, as a district court, in its limited power under Article III, despite having, under interpretation, said those rights didn't transfer? Well, it's a court of equity. But it is a court of equity. Your Honor, I would point you to the Luckett v. Del Park Supreme Court case that we cited in our blue brief. Because there, the Supreme Court was very specific about what a court of equity can and can't do in this situation. And I'll point out that we never got, there was no argument whatsoever by, in the red brief, about that case. And that case is very important. If you look at page 41 of our brief, and this is quoting Luckett from page 511, it specifically said that a patentee may not make it a patent case conditioned on his securing equitable relief as to the contract. So what was going on in Luckett was that the former patentee was trying to get the assignment of the patent, so very similar to what we have here, and then was seeking an injunction, preliminary injunction, various other patent infringement relief. The Supreme Court said, you can't do that in the last 80 years or so? 90? Well, I think most, Your Honor, most patentees, when they face this issue, they refile the case, right? They perfect their standing and they refile. That's what, I mean, this was raised three months after the complaint. Complaints filed in April. We put in an answer in July saying, look, you lack standing. They do new assignments, and we don't deny that the assignments they did in September were correct assignments, but they don't refile the case. We file a brief saying, look, standing is determined when the complaint is filed. They still don't refile the case. We're here this many years later because of the delay on their part in not refiling. They could have refiled this case and none of this would be an issue, but it's an issue because they chose not to. They chose to move ahead despite the law. They chose to say, we're going to go ahead. We're going to seek reformation. The problem is Article 3 controls federal courts, whether it's equitable or legal. Article 3 controls the power of federal courts to give any remedy. That includes the equitable remedy of reformation. But the equitable remedy of reformation exists for a particular purpose. Is it your argument that reformation under state law can never render Article 3 standing? Well, certainly, for example, let's say they come into the court and said, we want you to reform the assignment to give us standing, to give us the patent rights. And the court did that. They could then add a claim for presumably for patent infringement. So it is effective as of the date the reformation happens, but it doesn't retroactively create the power that the court needed. But the reformation has retroactive effect, isn't that right? I mean, if you reform a contract, then the contract after reformation is viewed as having been valid or without that defect all along. If the court had power to grant reformation, then that reformation remedy would, in fact, have whatever play it does with the rights. So frankly, Your Honor, one thing I'd point out is it's not with respect to third parties. In the second restatement of contract, a third party like Arkwright would actually not be subject to any retroactive impact of reformation. The restatement is very clear on that point. It's important that third parties not be disadvantaged. But the point here is whether the court ever had the power to entertain granting a remedy to a party where it lacked Article 3 jurisdiction because the plaintiff had no rights in the patent. The plaintiff came into court with no rights in the patent. Now, a court certainly has jurisdiction. Yeah, go ahead, Your Honor. Let me be clear. Are you saying that the remedy of reformation, the state law remedy, can it never result in rendering or establishing Article 3 standing? Not at all, Your Honor. So for example, if Schwindemann had gone to Minnesota State Court and asked for this contract to be reformed, and the contract was reformed by a court of general jurisdiction that had that power, Schwindemann then could have gone to federal court and said, I have the rights. That's not what they did. They didn't do that. They went to a court that didn't have the power because it's a federal court that requires Article 3 jurisdiction. We answered within three months saying, hey, this court doesn't have the power. And instead, they were like, we're going ahead. They signed assignments where they said that, you know, these rights, we don't have these rights, but we're giving them over. We pointed out, jurisdiction has to be at the time of the complaint. Again, they kept moving forward. They could have refiled at either of those points, and this issue would not be before this case. This court has been strong in saying, look, there are policy reasons, and there's just the command of the Constitution that under Article 3, we don't entertain cases. And respectfully, the Luckett versus Delpart case in the Supreme Court is very similar. I know it's from almost a century ago, Judge Wallach. I understand that. But if you look at that case, the plaintiff wanted inequity. Please cancel this contract. Reform it so that I get my rights back. And then I want to enjoin these other folks because they're infringing my patent. And the Supreme Court said, can't do that, and dismissed or actually affirmed the district court having dismissed that patent infringement claim, the attempt to get a preliminary injunction for patent infringement, because the Supreme Court said you cannot take and use the potential equitable change in the contract rights in order to base an infringement claim at the same time. You're into rebuttal time, but I'd like for you to address the issue of the prejudgment interest. Yes, Your Honor. So the prejudgment interest, General Motors is a fairly clear case in terms of saying from the Supreme Court that what prejudgment would have been. So if there are royalty payments, you give prejudgment interest based on when those royalty payments would have occurred. Here, the district court didn't do that. The district court instead took all of the damages for all the royalty payments across five years, took all of that, put it at the first date, and gave interest from that date. Now, in the reply brief or in the response brief, we are told that this was a lump sum judgment. If you look in the record, there is no mention of lump sum by any expert, by anyone talking about damages. This is not what this court found, for example, in Comcast IP, where this court said the reason we're allowing interest from the very first date is because both experts agreed that this would be a lump sum payment. That's not what happened here. Here, both experts used actual sales as the calculation. It wasn't anticipated sales as of that date of the negotiation. It was actual sales. And that means both experts were talking about royalty payments based on when those actual sales occurred. And to grant interest, contrary to General Motors, is a violation of the law, as set forth by the Supreme Court, and frankly is an enhancement. I mean, it really goes into what 285 is designed to do. What happened was the plaintiff got more than the plaintiff would have gotten if Arkwright had made payments each year like the you would have gotten except under 285. And that's not the case here. Okay. Thank you, Your Honor. Mr. Padmanabhan, you have two minutes to reserve three for your cross-claim. That's correct, Your Honor. Okay. You may proceed, sir. Please, the court, Your Honor. My plan today was to just go through the issues on appeal, first addressing Arkwright's issues. And I'm going to start with standing because that's their primary challenge. This court's law, as well as all the district courts that apply this case in this type of a scrivener's error type issue, has repeatedly found standing. Courts repeatedly always have had the jurisdiction to be able to assess when a party challenges standing to find if there is standing. In this case, in Minnesota, Judge Montgomery went way beyond what many courts do. She first found that there was a writing under 261. And then she went forth and said to the parties, give me the evidence to find out if there's an actual agreement so that there would always be constitutional standing. So she knows for sure that as of the date that the lawsuit was filed, she had all of the rights. And so the judge then held basically a summary judgment where she looked at the evidence, found that there was an offer, there was acceptance, there was consideration, but she didn't stop there. Then she saw that the actual document varied from that intent of the parties, and then went one step further to find out if there was a mutual mistake. Because in this case, both parties, ACT and Schwendemann, used the same lawyer. The lawyer made a scrivener's error and therefore fixed it. The basic law on the reason Reformation works so well is then you know now as a every policy reason undermines. How do you align the case of Paradise Creations with this case? So Paradise Creations, your honor, doesn't really work. The better case for this case is Speedplay. But Paradise Creations... Let me just find it. I apologize, your honor. I just can't. So Paradise Creations, your honor, the fundamental difference, that's the Florida case, the fundamental difference there was there was a dissolution. At the time that the assignment happened, the corporation never existed and could not practice business. And then the corporation came back and what the court said was, hey, as an administrative matter, we're not going to be able to make that retroactive. That is not the situation here. Here, what the court, what the Speedplay, she looked at the agreement itself and said, yep, that is a written agreement. But there's a scrivener's error because the docket number says, would refer to the 845 application, but the actual serial number wasn't the same. A situation that's happened before. But in this case... In that case, in Paradise, we said that state law that allegedly best enforceable title retroactively, which is what we have here through the affirmation, it says does not sufficiently confer article three standing. So it seems to me you have a decision by this court standing in your path. It's a very different scenario because in that state law, they're talking about a corporation that did not exist and having some regulations have when it comes back into good standing. This state law that we're talking about here falls squarely within what this court always does and what it's always agreed, which is you look at an assignment, then you look at the state's law for addressing and interpreting that assignment. And so all the, all what the district court did, and it's even in East Southwest Fuels where reformation was used. Here, there was no assignment until the reformation decision was made, correct? Here, there wasn't, there was a writing that qualified as an assignment. There was a scrivener's error. But isn't it undisputed that that writing did not assign the 845 application? The writing did not, only because there's an ambiguity there between the docket number, which refers to the 845. I mean, it was a valid, it was a valid assignment, just for the wrong pen. Well, there's an ambiguity in there because it depends on if you look at the docket number. When you look at the strikeout and you see the 021, that goes to the right docket, right patent number. But if you look at the actual serial number, there's a difference. So she could have gone in either direction. But what she said was, well, at that point, that is not clear which one it's assigning to. So she looks at the intent of the parties, but she used reformation, which is completely consistent with Minnesota contract law and allowed by this court. Correct, and that reformation makes the assignment, an assignment of the 845 pen, retroactive back to the date that the lawsuit was filed. When you say retroactive, the assignment by its, the reformation by its nature doesn't go back, it doesn't find it now and go retroactive. The rules of agreement made, she looks at the date when the strikeout was made and sees what, was there an agreement right then? And so there's no, there's no point back. When we're looking at Article III standing, we're looking backwards at the date that the, that the complaint was filed. So at that point, we would say, was there, does this reformed agreement confer Article III standing or not? So that, in a way, that's a retroactive looking back and that's what happened in Paradise Creek. Your argument seems to be that if the contract in fact existed before the complaint was filed and the court simply found through reformation that it was making clear that the contract existed before the complaint was filed. That's exactly right, Your Honor. That is exactly right. Because the contracts always existed. There's never reason to go back and the reason it's different in Paradise Creations is at the time the assignment was made, the corporation couldn't pot, wasn't in business. There is, by law, it was out of business. And when it came back into good standing, it was because of a creation of contract. Then they said, because it's now back in good standing to try to step back here, the situation is, and it's always been, misstanding it. Now that the, that the corporation is, it was dissolved and once it came back, that all the acts it took during that moment of dissolution were now valid. I'm sorry? Were now valid. Were, that was the argument. That was the finding. And the court said, as to the assignment, even when it came back in good standing, the things that happened when it was dissolved did not, you can't go back. That's what this court said on that. But that's different from, in this case, where from the very beginning, well before this patent application was ever, before this patent suit was ever filed, it was clear from the facts as found of no error whatsoever, that the parties had already made that transfer. There was no standing issue. And it's exactly what the law is intended to do. It's what your case law throughout has done in speed play. In every Scrivener's error case, courts have a chance to look at the intent of the actually have all of the rights that it needed to be able to maintain the case prior to the lawsuit. Did the Minnesota statute of fraud require a writing for this transfer? Minnesota statute of frauds? I don't know, Your Honor. I mean, I imagine, because he really did analyze this under section 261 and found that it was a writing requirement was met. So to the extent that the writing requirement was met for that, it would have met for the statute of frauds. I understand that. My question is, was there a writing requirement under Minnesota law as opposed to 261? I don't know. I don't know, Your Honor. And so anyway, there's no clear on any of those findings. And for that reason, standing should be affirmed in this case. And the other point that I'll make in this that confirms all of this is, if you look at the party's actions, and she says this in her opinion, the parties from the time when this transfer happened back when they made the... She did everything she promised. Your point is, she did everything she promised. She did everything she promised, and they acted in accordance with that. And so for those reasons, the standing decision should be affirmed. In terms of prejudgment interest, because you asked about it, the judge has discretion on setting the rate. Who called this a lump sum? I believe it was the judge, Your Honor, that first thought it was lump sum. And then when he decided that the 10% would be applied as lump sum. And I think it comes from the order. I don't have a pin side. I had my colleague look at it. But I think that's where it came up, because I think this argument came up during that briefing. And then the judge said, I'm going to apply this 10% across the board. And in terms of 549B, the reason it didn't apply was simply because federal law mandates that prejudgment interest goes from the date of first infringement to judgment with the only... Yeah, so he doesn't call it lump sum per se. But what he says is consistent with the plain language of Minnesota statute 549.09, the court concludes that it is appropriate to calculate prejudgment interest on the total damages award and not based on the number of infringing sales per year. It's on appendix page 93. In terms of our issues, Your Honor, there's a couple I want to highlight. One is on the motion in limine where the court addressed, barred us from being able to get damages prior to 2010. That is an issue where even though the factual findings are clear error, the conclusion on the scope of the claims is de novo. And the facts really aren't at issue there. The figure five was amended to be consistent with the sentence. The prior judge that was on this case, Judge Montgomery, in a claim construction hearing had clearly, in a claim construction order, had clearly used the sentence from the spec. The figure five doesn't vary that sentence. And so the scope of the claims should be substantially the same and the court should be reversed on that. The bigger issue is this court, that trial judge on the day before closings took away the lost profit claim from the jury. And that's reviewed under Eighth Circuit and it's a de novo review. In this case, the error the judge made is he weighed credibility. So under Eighth Circuit law, evidence without weighing credibility of the witnesses, if you do that and there's only one reasonable conclusion, that's the only time you can grant JMOL. Here the judge made three errors on that. One, the judge did not assume that all the facts that helped Schwendemann were proven as fact. He didn't give her the benefit of all the reasonable inferences. Who was the judge? The district, the trial judge was Judge Thunheim, but the earlier judge was Judge Montgomery. He got transferred towards the end. And lastly, you have to assume all conflicts in the evidence are resolved in her favor. And the one other thing that's important here is the only thing that the judge could accept as true was really disinterested witnesses and here there were none. So if you look at the three buckets of evidence that the judge had, he had one set of evidence from AACI's own former president where he said the market was only these three parties and we had proved they had, we had evidence that all of that was not, there were no non-infringing substitutes there. The second bucket was AACI's own witnesses and you can't give credibility. That's one that's purely for the jury. The judge assessed their credibility, which was improper for JMOL. The third bucket of witnesses was Ms. Schwendeman herself. Whatever her testimony is, that again is argument for the jury and for the jury to decide who's right and wrong on it and to decide if there is a non-infringing substitute or not. You're into your, your other time on your teleconference time. I'm going to scroll you back to four minutes. Thank you, Your Honor. Appreciate it. For the first time on argument, we now hear that there's an ambiguity in the written document. I'll point the court both to page 13 of the record and page 32 of the record where the judge, district court judge here, said on its face the terms of this agreement do not transfer the patent rights at issue. As a matter of interpretation, the district court judge did not find and found to the contrary that any of the patent rights needed to support Article III jurisdiction got transferred. That is why the district court judge had to go on to reformation and that is why this case is different than speed play. It's different than southwest e-fuel. In those cases, this court or the Eastern District of Texas interpreted the language and said, yeah, there is an issue there. Your, your, your opponent describes this as a scrivener's error, that that's what we're looking at. But wasn't it undisputed that there was a valid assignment but not for the 845 patent? That's exactly right, your honor, that the district court found. In effect, the reformation didn't fix an error or a scrivener's error in a, in a contract or agreement. It just created a whole new agreement. It took this set of patents in an assignment and replaced it with this set of patents is what it did. We don't disagree that that was a written document. The problem is it was a written document assigning property that has nothing to do with Article III jurisdiction in this case. The district court acknowledged that and said, I need to reform it so that the patent rights in this case are assigned by that document. So the document actually assigns the right patents. And the judge knew this was an issue. The judge actually certified an appeal, an interlocutory appeal on that question specifically saying, can I reform after, you know, the case has started to change this issue? And what are, what's being ignored here is that the judge specifically under Minnesota law on page 13 said, from an interpretation point of view, this doesn't do it. This transfers rights that don't give you Article III jurisdiction. I have to go to reformation. The court, under this court's ruling in Paradise, under the Supreme Court's ruling in Luckett, the court doesn't have power to offer the remedy of reformation when there's no Article III jurisdiction from the date of the complaint. That's where we sit on standing. And Paradise, Paradise is right there. Luckett is right there. That's the key issue. And this district court was actually very careful to tell us what interpretation meant and then what reformation meant, which is actually very helpful. So if you read, for example, that Southwest eFuels case, it's hard to tease out where the judge is interpreting the written agreement and where the judge is reforming. In fact, what the judge really says is, well, the interpretation gets me to constitutional standing, and then I can reform. That's not what happened here. Here the judge very clearly said, when you interpret this under Minnesota law, the rights aren't there. And that's why I have to go to reformation. So you're on just a couple of points with regard to the other issues that were raised. With respect to the interest issue, I 100% agree. Lump sum is nowhere in the record until they're briefed. The judge may have said it, but it's not in the evidentiary record. Neither expert ever talked about lump sum, and there's certainly no evidence to support lump sum. Lump sum usually happens where a damages expert says, here's what the parties anticipated on that day of the reasonable negotiation. And based on that anticipation, they would have agreed to this number. Neither expert did that. Here, both experts said, here are the sales. Here are the percentages we apply. That is exactly what General Motors, the US Supreme Court, said. You do the interest based on those payments. Finally, they can't ignore Schwindemann's testimony. Schwindemann's testimony, which the district court relied on to grant judgment as a matter of law, is their own witness. They can't ignore that testimony. They can't tell the district court to ignore it in granting JMOL. And the district court judge correctly took it into account. Thank you, Your Honor. Unless there are any further questions. Your Honor, on your question about the agreement itself. So the agreement itself wasn't a complete rewrite. If you look at the agreement and what the judge did. Is this on your counterclaim that you're addressing? I'm talking about just the standing issue. So just on the standing issue, just the initial agreement. Just to be clear, the initial agreement with the contract that the district court was looking at had a docket number, the .021 docket number. We got that. And so the judge did find that to be an intentional reduction of the contract. So it wasn't a complete rewrite. On our counterclaim, on Schwindemann's testimony, if you look at the testimony itself, and this goes through a chapter and verse in our brief, none of that questioning is specifically on dark fabric transfer. But more importantly, it's on the bigger question. You don't have to get to that level of detail. It's just simply an issue where everybody has something to say to the jury, but it's in the purview of the jury to be able to make that determination. That's all I have, Your Honor. Thank you.